# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

LEONA VICTORS (EMENYONU)  
25548 Hill Road  
Greensboro, Maryland 21639

and

HOME CARE, INC. d/b/a  
LEONA'S HEART ASSISTED LIVING  
25548 Hill Road  
Greensboro, Maryland 21639

        Plaintiffs,

        v.

WENDY A. KRONMILLER  
Maryland Department of Health and Mental Hygiene  
Office of Health Care Quality  
Spring Grove Center  
55 Wade Avenue  
Catonsville, Maryland 21228

and

JANE WESSELY  
Division of Waiver Programs  
201 West Preston Street  
Baltimore, Maryland 21201

and

BARBARA SHANNON  
Residential and Community Program Unit  
Assisted Living Program  
201 West Preston Street  
Baltimore, Maryland 21201

and

ED SADLER  
Maryland Department of Aging  
100 Schauber Road  
Chestertown, Maryland  21620

CASE NO.

Original Complaint
   Declaratory Relief
   Injunctive Relief
   Damages
Demand for Jury Trial

|  | : |
|---|---|
| SERVE ON: | : |
| | : |
| Honorable Doug Gansler Attorney General | : |
| 200 St. Paul Place | : |
| Baltimore, Maryland 21202 | : |

and:

| | : |
|---|---|
| JAMES F. CROSSON | : |
| 73 Franklin Street | : |
| Annapolis, Maryland 21401 | : |
| | : |
| Defendants. | : |

-----------------------------------------------------------------------

## COMPLAINT FOR DAMAGES, DECLARATORY AND OTHER RELIEF

Plaintiffs Leona Victors (Emenyonu) and Home Care, Inc. d/b/a Leona's Heart Assisted Living ("Home Care"), Plaintiff, by and through undersigned counsel, files this Complaint for Damages, Declaratory, Injunctive and Other Relief against the Defendants named herein, and in support of said Complaint states and avers as follows:

### A.     PRELIMINARY STATEMENT

Leona Victors (Emenyonu), a United States citizen and Maryland resident, and Home Care, Inc. d/b/a Leona's Heart Assisted Living ("Home Care"), a Maryland corporation, bring this civil rights action against the Maryland State Department of Health and Mental Hygiene ("DHMH"), Office of Health Care Quality ("OHCQ"), Division of Waiver Programs ("DWP"), Maryland Department of Aging ("DOA"), and certain agents, servants, employees and officials of DHMH, OHCQ, DWP and DOA, for declaratory relief, injunctive relief, compensatory damages and punitive damages. In addition, the Plaintiffs also bring Maryland claims against Defendant James F. Crosson for breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious intentional interference with prospective advantage.

2

## B.    INTRODUCTION

1.    Home Care, Inc. d/b/a Leona's Heart Assisted Living ("Home Care") is managed by an African American woman by the name of Leona Victors (Emenyonu). Ms. Victors is an African American woman who is a Registered Nurse (RN) and who holds a Bachelors degree in Nursing (BSN). Ms. Victors has lengthy experience in all fields of nursing from bedside care to health care management.

2.    Home Care is the corporate name for the assisted living facility named Leona's Heart Assisted Living. The Home Care facility is located in Greensboro, Maryland which consists of a very low demographic income population.

3.    The Home Care facility provides Level 1, 2 and 3 skilled nursing services in several areas, including, a professional staff managed by a full time registered nurse, access to health and medical services, various programs, meals and transportation.

4.    Home Care is run by African American managers and has several African American employees. Under the ownership of Ms. Victors, the Home Care facility staff originally numbered 14 but has since been reduced to 8 as a result of the discrimination and action of the Defendants named herein as alleged below.

5.    The Maryland State Department of Health and Mental Hygiene ("DHMH"), Office of Health Care Quality ("OHCQ"), Division of Waiver Programs ("DWP"), Maryland Department of Aging ("DOA") are all controlled by Caucasian ("white") directors, officials and managers, and the regulatory arms and units of such governmental entities are likewise run, directed and controlled by white individuals.

6.    The OHCQ issues the operating license for assisted living facilities. The DOA issues the Medicaid waiver numbers. Both OHCQ and DOA are part of DHMH.

3

7.     Defendants Wendy A. Kronmiller, Jane Wessely, Barbara Shannon and Ed Sadler are all white individuals employed by the Maryland governmental entities of DHMH, OHCQ, DWP and DOA during all times relevant to this lawsuit.

8.     Defendant James F. Crosson ("Crosson") is a white male who was the previous owner of the assisted living facility under the same corporate name "Home Care, Inc." At the time when Crosson owned the assisted living facility, he called it Blue Heron Assisted Living.

9.     DHMH, OHCQ, DWP, DOA and their officials, along with their units and directors, have engaged in, maintained and enforced and continue to engage in, maintain and enforce, policies and practices that have discriminated against Home Care and other African American owned or African American run and controlled organizations in favor of white owned or run and controlled organizations because of race. This discrimination is regarding the licensing and operation of assisted living facilities and, upon information and belief, other similar organizations designed to provide services to the elderly, homeless and otherwise disabled individuals.

10.    Specifically, DHMH, OHCQ, DWP, DOA and their officials, along with their units and directors, have exhibited a concerted and aggressive practice to enforce and prosecute the rules and regulations pertaining to assisted living facilities in a discriminatory and disproportionate manner in favor of white-owned assisted living facilities, and in disfavor of African American owned assisted living facilities.

11.    DHMH, OHCQ, DWP, DOA and their officials, along with their units and directors, have engaged in, maintained and enforced and continue to engage in, maintain and enforce, policies and practices for the specific purpose that assisted living facilities like Home Care facility owned by African Americans will be shut down so that competitor assisted living

4

facilities owned by white individuals may survive, thrive and exist in place of the African American facilities.

12.     Defendant Crosson conspired with and/or facilitated the discriminatory actions of DHMH, OHCQ, DWP, DOA and their officials, along with their units and directors, during and after Crosson sold the Home Care facility to Ms. Victors.

## C.     JURISDICTION AND VENUE

13.     Plaintiff's claims arise under 42 U.S.C. Sections 1981 and 1982; the Due Process Clause of the 14th Amendment, U.S. Constitution; the Equal Protection Clause of the 14th Amendment, U.S. Constitution and 42 U.S.C. Section 1983; and 42 U.S.C. Section 1985.

14.     The Court has jurisdiction pursuant to 28 U.S.C. Sections 1331 and 1343(3).

15.     Venue lies in the District of Maryland pursuant to 28 U.S.C. Section 1391(b).

16.     This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. Section 1367.

## D.     PARTIES

17.     Home Care, Inc. d/b/a Leona's Heart Assisted Living ("Home Care") is a Maryland corporation, with its principal office and place of business at 25548 Hill Road, Greensboro, Maryland 21639.

18.     The owner of Home Care, Leona Victors (Emenyonu), is an African American woman who was born in the country of Nigeria in Africa.

19.     Wendy A. Kronmiller ("Kronmiller"), a white female, is the Director of the Office of Health Care Quality, a unit of the Maryland Department of Health and Mental Hygiene, who has a place of business and principal office in Baltimore County at 55 Wade Avenue, Catonsville, Maryland 21228.

5

20.     Jane Wessely ("Wessely"), a white female, is the Chief of the Division of Waiver Programs, Medicaid Waiver, Maryland Department of Health and Mental Hygiene, who has a principal office and place of business in the City of Baltimore at 201 West Preston Street, Baltimore, Maryland 21201.

21.     Barbara Shannon ("Shannon"), a white female, is the Health Facilities Nurse Surveyor, Residential and Community Program Unit, Assisted Living Program, Office of Health Care Quality, who has a principal office and place of business in Baltimore County at 55 Wade Avenue, Catonsville, Maryland 21228.

22.     Ed Sadler ("Sandler"), a white male, is an Ombudsman for Upper Shore Aging, Inc., Maryland Department of Aging, who has a principle office and place of business in Caroline County at 100 Shauber Road, Chestertown, Maryland 21620.

23.     James F. Crosson ("Crosson"), a white male, is the former owner of the assisted living facility at issue in this lawsuit. At the time when Crosson owned the facility, the facility was operated under the name "Home Care, Inc. d/b/a Blue Heron Assisted Living." Crosson has a principle office and place of business in Anne Arundel County at 73 Franklin Street, Annapolis, Maryland 21401.

24.     The Maryland Department of Health and Mental Hygiene ("DHMH") is an agency of the State of Maryland with its principal office and place of business in the City of Baltimore at 201 West Preston Street, Baltimore, Maryland 21201. The Maryland Department of Aging ("DOA") is part of the organizational structure of DHMH. DOA issues the Medicaid waiver numbers used by assisted living facilities.

25.     The Office of Health Care Quality ("OHCQ") is a division or unit of the Maryland Department of Health and Mental Hygiene ("DHMH") with its principal office and

6

place of business in the City of Catonsville at Spring Grove Center, 55 Wade Avenue, Catonsville, Maryland 21228. The Division of Waiver Programs ("DWP") is part of the organizational structure of DHMH. OHCQ issues the operating license for assisted living facilities.

## D.   FACTUAL BACKGROUND

26.   Home Care, Inc. d/b/a Leona's Heart Assisted Living ("Home Care") is an assisted living facility located at 25548 Hill Road in Greensboro, Maryland. The payment source for the facility is primarily from Medicaid waiver payments from the federal government administered by the Medicaid waiver unit of the Maryland Department of Aging.

27.   For all the years prior to the purchase of the Home Care facility by an African American woman, Leona Victors (Emenyonu), the Home Care facility was owned by white individuals. The participation of the previous white owners of the Home Care facility in the Maryland Medicaid Waiver Program, as allowed by OHCQ and DOA, enabled the previous white owners to operate the Home Care facility on a profitable basis.

28.   However, after the Home Care facility was purchased and therefore owned for the first time ever in its history by an African American woman, Ms. Victors, DHMH, OHCQ, DWP and DOA, through its officials and agents, suddenly changed its practice and began to enforce discriminately and arbitrarily various alleged violations of rules and regulations. These alleged rules and regulations violations at the Home Care facility existed **BEFORE** the facility was purchased by Ms. Victors and **DURING** the time when the Home Care facility was owned by white individuals.

29.   When Ms. Victors purchased the Home Care facility, she expended a great amount of her personal resources to buy the facility under a specific three-year business plan

7

to recoup her expenditures and run the Home Care facility as profitably as the previous white owners. Ms. Victors specifically formulated her business plan for the facility based on the continual operation and licensed of the facility by DHMH, OHCQ, DWP and DOA in the Maryland Medicaid Waiver Program. As a result of the discrimination against her by all the named Defendants herein, Ms. Victors seeks, in her name as well as the name of her facility Home Care, Inc. d/b/a Leona's Heart Assisted Living, compensatory and punitive damages for the lost on her investment, emotional distress, pain and suffering, as well as certain declaratory and injunctive relief. The following factual allegations provide a chronology of discrimination and arbitrary action by the Defendants herein as follows:

30.     This operating license issued by OHCQ, in particular, was valid and effective from December 12, 2004 through December 11, 2006. The facility at that time was owned by James F. Crosson ("Crosson") under the name of Home Care, Inc. d/b/a Blue Heron Assisted Living. The OHCQ operating license was specifically issued to the corporate entity, Home Care Inc. The OHCQ operating license was not issued to Crosson in his individual capacity.

31.     On February 15, 2006, pursuant to the applicable rules and regulations, representatives of OHCQ conducted a "re-licensure survey" to determine if the Home Care facility was in compliance with Maryland license requirements for assisted living programs. The survey team in February 2006 included Defendant Barbara Shannon.

32.     The purpose of the survey under regulation is to discover, assess and report "deficiencies" at the assisted living facility. Under normal circumstances, any problems detected by the survey team would be brought to the attention of the assisted living facility owner and would be addressed and corrected by giving the owner reasonable time to respond. Under only rare occasions, the survey team will issue a report under the authority of OHCQ to

8

the owner of the assisted living facility listing "deficiencies" and requesting an immediate response regarding more serious and imminent problems.

33.     Under the applicable rules and regulations, while there is no normal response time specified as to when the OHCQ will submit a report to the owner of an assisted living facility regarding the more serious problems called deficiencies, by the very nature of the more serious type of problem at issue in a deficiency, such reports submitted by the OHCQ after a survey team visit is quite fast, and typically within one month of the survey team's inspection of the facility.

34.     In the case of the survey's team inspection of the Home Care facility in February 2006, the OHCQ did not issue a report regarding deficiencies at the Home Care facility in the month of February 2006, nor in the month of March 2006, nor in the month of April 2006, nor in the month of May 2006. All of the months of February, March, April and May of 2006 was during the time when Crosson, a white individual, owned the Home Care facility.

35.     On April 24, 2006, Crosson executed a stock and membership purchase agreement to sell all the outstanding capital stock and membership interest of Home Care, Inc. to Leona Victors (Emenyonu). Under that purchase agreement, Ms. Victors would purchase all of the rights and licenses of Home Care, Inc. d/b/a Blue Heron Assisted Living. This purchase agreement specifically included the purchase by Ms. Victors and transfer by Crosson of the Home Care facility's OHCQ operating license and the DOA Medicaid waiver number.

36.     Under the applicable rules and regulations, Ms. Victors was not required to renew the Home Care facility's OHCQ operating license until the date when the OHCQ operating license previously issued to Crosson was due to expire on December 31, 2006.

9

37.     Crosson also did not disclose that an OHCQ survey team had inspected the Home Care facility in February 2006, and that OHCQ would be submitting a report based on the inspection regarding alleged deficiencies at the Home Care facility.

38.     Crosson also did not disclose correspondence exchanged between himself and DOA shortly after he signed the purchase agreement on April 24, 2006.

39.     The stock and membership purchase agreement closed on June 9, 2006. On that date, Ms. Victors purchased the Home Care facility for a purchase price of $1 million dollars. The purchase price does not include the significant amount of additional money Ms. Victors incurred related to the purchase of the Home Care facility (i.e., appraisal costs, taxes, bank fees, etc).

40.     On June 9, 2006, Ms. Victors became the first African American ever to own the Home Care facility and officially took over the premises in Greensboro, Maryland and began to run the facility.

41.     Ms. Victors eventually changed the operating name of the facility from Home Care, Inc. d/b/a Blue Heron Assisted Living to Home Care, Inc. d/b/a Leona's Heart Assisted Living. The legal name of the facility remained Home Care, Inc.

42.     At the time when Ms. Victors purchased the Home Care facility on June 9, 2006, there were approximately 26 residents living there. Out of the 26 residents, 14 were Medicaid waiver assistance, and the remaining residents had applications pending.

43.     Almost immediately after it was discovered that the assisted living facility was now owned by an African American woman, DHMH, OHCQ, DWP, DOA and their officials, along with their units and directors, began a determined, aggressive and ultimately successful campaign of harassment, arbitrary enforcement of rules and regulations, and discrimination

10

specifically designed to put the now African American owned facility out of business by driving up Ms. Victors' costs for maintaining the facility, forcing her to hire attorneys, removing the Medicaid funds without cause or due process, and removing her residents without cause or due process.

44.     The discrimination by DHMH, OHCQ, DWP, DOA and their officials, along with their units and directors, was organized along two discrete fronts: (1) Arbitrary and unsupported denial of Medicaid benefits forcing an administrative appeal and decision by the administrative law judge affirming the legitimacy of the Plaintiffs' obvious entitlement to Medicaid funding; and (2) Arbitrary and unsupported reporting of scores of alleged "deficiencies" driving up costs to "fix" the alleged "deficiencies," spanning over eight months and costing Ms. Victors thousands of dollars and leading to the removal without cause or due process of almost all of her residents.  The chronology of the factual allegations regarding the discrimination follows:

45.     Soon after Ms. Victors purchased the Home Care facility on June 9, 2006, Defendant Ed Sadler, the Upper Shore Aging ombudsman, and an employee of Defendant James Crosson, Leslie Ruhl, began to make frequent and confrontational visits to the Home Care facility in Greensboro, Maryland.

46.     Sadler's and Ms. Ruhl's sudden visits coincided with the same time that Defendant Crosson's wife, Sandy Ironmonger, also began visiting the Home Care facility as frequently as three times a week. These visits by Crosson's wife occurred **AFTER** Defendant Crosson had sold the facility to Ms. Victors and, based on information and belief, occurred when Ms. Ironmonger had never visited the Home Care facility before for at least five years prior.

11

47.     With respect to Sadler's visits to the Home Care facility, Sadler told Ms. Victors and her staff: "There is no way that [Ms. Victors] will be allowed to practice in this county." Sadler also stated repeatedly that Ms. Victors must be "shot down" and that he was acting on the authority and direction of the "higher ups" within DHMH.

48.     With respect to Crosson's wife's visits to the Home Care facility, Ms. Ironmonger made various statements to the staff, all of which were clearly designed to undermine Ms. Victor's authority as the new owner and/or encourage the staff to leave the facility under Ms. Victors' ownership.

49.     For example, Ms. Ironmonger indicated that she and her husband, Defendant Crosson, know people in DHMH, OHCQ and DOA and that Ms. Victors will be "shut down in no time" and that her Medicaid waiver number would be "yanked" and that Ms. Victors would "never get it back, no matter what she did."

50.     Around the same time that Defendants Sadler and Defendant Crosson's wife, Ms. Ironmonger, were predicting that Ms. Victors and the Home Care facility would be "shot down," OHCQ through its officials and agents suddenly became interested in the alleged deficiencies at the Home Care facility. On or about June 21, 2006 – not even two weeks after Ms. Victors had purchased the facility – Defendant Sadler and Crosson's employee Leslie Ruhl personally delivered a document entitled "Notice of Directed Plan of Correction" (the "First Report").

51.     The cover letter of the First Report indicated that a re-licensure survey had been conducted on February 15, 2006. The First Report contained 55 pages of alleged deficiencies at the facility. The First Report indicated that requirements regarding several of the alleged deficiencies "must be met immediately." The cover letter of the First Report also

12

indicated that "[w]e are forwarding these deficiencies to our legal counsel for a determination of whether additional licensure action is appropriate."

52.     Each and every one of the alleged deficiencies contained in the First Report was present during the time the Home Care facility was owned by Defendant Crosson.

53.     Overall, DHMH, OHCQ, DWP and DOA, through its officials and agents, intended the First Report to create a number of problems for Ms. Victors so that there would be a tremendous burden on her to spend her money and time to address such deficiencies when she had only been the owner for less than a month. Ms. Victors, accordingly, was forced to retain Attorney Martin B. King of the firm Gorman & Williams in Baltimore, Maryland and expended a tremendous amount of resources in legal fees and related expenses in order to combat the discrimination against her.

54.     In response to the First Report, Ms. Victors deployed a tremendous amount of her time and resources to address in good faith each of the deficiencies asserted by OHCQ.

55.     From August 28, 2006 through September 1, 2006, OHCQ and its representatives conducted a second re-licensure survey at the Home Care facility. Defendant Shannon was a member of this survey team. Defendant Shannon was also a member of the survey team that had inspected the Home Care facility in February 2006 when Defendant Crosson, a white male, owned the facility.

56.     On September 25, 2006, Ms. Victors received a second report entitled "Notice of Follow Up To Directed Plan of Correction" (the "Second Report"). In the Second Report, OHCQ actually **increased** the number of alleged deficiencies at the Home Care facility in **64** pages.

13

57.     Many of the deficiencies reported in the Second Report were simply wrong, and simply a copy of the deficiencies reported in the First Report, which the representatives of the survey team indicated had been corrected.

58.     Defendant Shannon, and other representatives of DHMH, OHCQ, DWP and DOA, purposely manipulated the results in the Second Report so that Ms. Victors would continue to experience financial hardship and spend unnecessary time and money addressing manufactured and exaggerated deficiencies at the facility.

59.     As a result of the repeated and misplaced findings in the Second Report, Ms. Victors' attorney requested a meeting to discuss the basis for the deficiencies reported in the Second Report and to request an extension on the unreasonable timetable demanded in the Second Report for the alleged deficiencies to be cured. Defendants Kronmiller and Shannon attended the meeting.

60.     After the meeting, Ms. Victors once again was forced to deploy a tremendous amount of her time and resources to somehow address the repeated alleged deficiencies reported by OHCQ.

61.     Meanwhile, on the Medicaid administrative side, Ms. Victors and Home Care were further discriminated against. On September 18, 2006, Ms. Victors received a call from the Upper Shore Aging, which is a part of DOA, informing Ms. Victors that Upper Shore Aging had been authorized to physically remove the residents at the Home Care facility.

62.     When Ms. Victors replied that she had received no notice or letter informing her of this decision, soon thereafter a letter dated September 18, 2006 was sent by facsimile to Ms. Victors' attention. In that letter, Defendant Jane Wessely, Chief of the Division of Waiver Programs ("DWP"), indicated that the Home Care facility is "not a Medicaid provider

14

and [has] fraudulently submitted claims for Medicaid payment."

63.     In the September 18, 2006 letter, Wessely indicated that Ms. Victors was required to return payment in the amount of $64,943.71 and that she would not receive payment for the outstanding Medicaid invoices she had submitted, in the amount of $21,000.

64.     Wessely also stated in the September 18, 2006 letter that Ms. Victors and Home Care had 30 days to appeal the decision and institute administrative proceedings in order to reverse the denial of the facility's Medicaid payments.

65.     Based on the above, Ms. Wessely directed representatives of Upper Shore Aging, including Defendant Ed Sadler, to physically remove 14 Medicaid Waiver residents **ON THE SAME DAY** the Plaintiffs were suppose to have 30 days to appeal.

66.     In fact, the physical removal of the residents began on September 30, 2006 and ended on October 2, 2006.

67.     The residents of the Home Care facility did not want to leave the home, and they physically and actively resisted being moved, sometimes resulting in injury to the residents inflicted by the representatives of Upper Shore Aging.

68.     In addition to not affording Ms. Victors and the Home Care facility due process, DHMH, DOA, DWP and OHCQ had no support for their position under the applicable rules and regulations for removing the Medicaid waiver residents, denying Medicaid waiver payment and reimbursement.

69.     The fact that DHMH, DOA, DWP and OHCQ were clearly wrong was confirmed by the decision of the administrative law judge on or about May 22, 2007, when the administrative law judge granted summary decision in the Plaintiffs' favor confirming that the Plaintiffs were obviously entitled to Medicaid funds.

15

70.     Even to this date, Ms. Victors and the Home Care facility still have not received the September, 2006 Medicaid waiver payment which they are owed, nor has the Home Care Medicaid waiver number been re-activated, both are entitlements due the Plaintiffs according to the decision by the administrative law judge

71.     By the time of the administrative law judge's decision in May 2007, however, Ms. Victors' resources had been destroyed. Ms. Victors was forced to spend a tremendous amount of her time, energy and money battling the discrimination from DHMH, OHCQ, DWP, DOA and their officials, along with their units and directors, on two fronts:  (1) The continual battle addressing the alleged deficiencies at the facility; and (2) the administrative proceedings regarding the Plaintiffs' right to Medicaid funds.

72.     Meanwhile, without order or authority prohibiting them from doing otherwise, DHMH, OHCQ, DWP, DOA and their officials, along with their units and directors, continued in their campaign to shut down the Home Care facility under ownership by an African American person.

73.     During the course of time from June 9, 2006 through to the present, the Defendants herein, in particular Defendants Crosson and his agents, Sadler and Shannon, have contacted various people and groups doing business with the Home Care facility in an effort to impede Ms. Victors' and the Home Care facility's successful operation.

74.     In addition, DHMH, OHCQ, DWP, DOA and their officials, along with their units and directors also continued to submit reports containing false deficiencies against the Home Care facility.  The survey teams, all led by Defendant Barbara Shannon, continued to look for, and in most cases simply made up, purported deficiencies all in an effort to delay the time when Ms. Victors could obtain a new OHCQ operational license (after the initial one

16

expired on December 31, 2006), and/or to drive up the money she had to spend to address the alleged deficiencies falsely reported against the facility.

75.     In total, OHCQ submitted four deficiency reports, the last two on December 20, 2006 and on March 2, 2007.

76.     Contrary to the lapse of time between the inspection by a survey team and the submission of a deficiency report greater than four months during the time when Defendant Crosson, a white male, was the owner; OHCQ submitted a report to Ms. Victors requiring her to expend still more resources, on each occasion, all within one month of the inspection.

77.     In a letter dated February 1, 2007, Ms. Victors' attorney requested that members of "senior management" be involved in the inspection process, including two African American employees of OHCQ.

78.     In response to that letter, Defendant Kronmiller visited the Home Care facility and thereafter she submitted an e-mail dated February 7, 2007, in which she stated: "[T]he surveyors will be discussing their observations and regulatory violations but they will not be making the final decision on licensure of Leona's Heart, its census, or on any conditions that will be set upon licensure. They will bring their findings back to the office and we will make those decisions next week."

79.     Despite Defendant Kronmiller's assurances, no final decision was made "next week" after her February 7, 2007 e-mail. In fact, Ms. Victors and the Home Care facility did not receive the OHCQ operating license until over two months later -- on April 24, 2007. There was no reason given for this delay.

80.     The above delay, harassment and overall destruction of the Home Care facility caused by the discrimination, arbitrary and unjust treatment by DHMH, DOA, DWP and

17

OHCQ, its officials, directors, agents, and units, as well as by Defendant Crosson and his agents, including his wife, have caused significant financial loss and damage to Ms. Victors, as well as emotional distress, and related pain and suffering.

81.     The business plan underlying her purchase on June 9, 2006 has been destroyed. To this day, Ms. Victors continues to suffer financial loss and the loss as a result of not being allowed to admit residents with a Medicaid waiver since the facility is not naturally designed for private pay residents. Presently, out of the 26 residents living at the Home Care facility when she purchased it, only 8 residents now live there.

82.     It is expected that Ms. Victors will have to close the Home Care facility because of the discrimination alleged above by Defendants Kronmiller, Wessely, Shannon and Sadler under color of law, as well as because of the violation of state law as alleged above by Defendant Crosson.

**COUNT ONE**
**(42 U.S. Code Section 1981)**
**(Against Defendants Kronmiller, Wessely, Shannon and Sadler)**

83.     Plaintiffs Leona Victors (Emenyonu) and Home Care, Inc. d/b/a Leona's Heart Assisted Living repeats and incorporates by reference under this Count One Paragraphs 1-82, as if fully set forth herein.

84.     Under 42 U.S. Code Section. 1.981(a), "all persons...shall have the same right...to make and enforce contracts...and to the full and equal benefit of all laws and proceedings for the security of persons and properties as enjoyed by white citizens."

85.     Defendants Kronmiller, Wessely, Shannon and Sadler targeted the Plaintiffs in the same manner that they have targeted other African American owned or African American controlled and African American run organizations regarding arbitrary enforcement and

18

application of the rules and regulations for assisted living facilities and like organizations.

86.     The selective and arbitrary application and enforcement of the applicable regulations by the Defendants named in this Count One was racially motivated because its purpose was to force the closure of African American organizations, including in this case Home Care Inc. d/b/a Leona's Heart Assisted Living.

87.     The discriminatory action alleged in this Complaint compares to the considerably more tolerant and conciliatory approach taken by the Defendants named in this Count One to white owned or white controlled and white run organizations that were allowed to resolve their deficiencies and violations through friendly mediation and stay in business. The closure of the Home Care facility will allow the Defendants named in this Count One, as they have done in past years when they, upon information and belief, have forced the closure of other African American organizations, to either promote white-owned competitor assisted living facilities in the area and/or install a white person as the owner of the Home Care facility.

88.     DHMH has not monitored nor scrutinized the conduct and actions of agents, servants, employees and officials of OHCQ, DWP and DOA and units of OHCQ. DHMH is responsible and accountable for their conduct.

89.     Defendants have violated and continue to violate 42 U.S. Code Section 1981 by discriminating against Ms. Victors on the basis of her race and national origin concerning Ms. Victors' right to operate a legitimate business for profit, make and enforce contracts in connection with running the business, and such other and further activities as enumerated under Section 1981.

90.     As a result of the discrimination by the Defendants named in this Count, the

Plaintiffs have suffered, and continue to suffer financial damage and loss as specified below in the Prayers for Relief, including and not limited to the loss of the investment in purchasing the Home Care facility, money spent in responding to the administrative reports regarding alleged deficiencies, money spent in battling the administrative denial of Medicaid funds, money and profit relating to the loss of residents, and attorney's fees.

## COUNT TWO
### (42 U.S. Code Section 1982)
### (Against Defendants Kronmiller, Wessely, Shannon and Sadler)

91.     Plaintiffs Leona Victors (Emenyonu) and Home Care, Inc. d/b/a Leona's Heart Assisted Living repeats and incorporates by reference under this Count Two Paragraphs 1-90, as if fully set forth herein.

92.     Under 42 U.S. Code Section 1982, "all citizens...are entitled to the same right...as is enjoyed by white citizens...to purchase...personal property."

93.     The actions of Defendants Kronmiller, Wessely, Shannon and Sadler in subjecting Plaintiffs to strident, harsh and racially discriminating selective and arbitrary enforcement and application of the rules and regulations for assisted living facilities has interfered with the ability of the African American owned and managed Home Care facility to transact business and minister to its residents, as well as interfered with the ability of the Home Care facility to properly be compensated by Medicaid payments.

94.     In contrast, the Defendants named in this Count Two have not interfered with or impeded the ability of the Home Care facility when it was owned by white individuals, as well as other white owned and managed assisted living care facilities, to transact business and minister to its residents, and has not interfered with the ability of the white owned facilities to be compensated by Medicaid payments.

20

95.     The Defendants named in this Count Two have violated and continue to violate 42 U.S. Code Section 1982 by having racial animus against Ms. Victors and her right to operate a business in this country, thereby depriving her of this right.

96.     As a result of the discrimination by the Defendants named in this Count, the Plaintiffs have suffered, and continue to suffer financial damage and loss as specified below in the Prayers for Relief, including and not limited to the loss of the investment in purchasing the Home Care facility, money spent in responding to the administrative reports regarding alleged deficiencies, money spent in battling the administrative denial of Medicaid funds, money and profit relating to the loss of residents, and attorney's fees.

## COUNT THREE
### (42 U.S. Code Section 1983)
**(Against Defendants Kronmiller, Wessely, Shannon and Sadler)**

97.     Plaintiffs Leona Victors (Emenyonu) and Home Care, Inc. d/b/a Leona's Heart Assisted Living repeats and incorporates by reference under this Count Three Paragraphs 1-96, as if fully set forth herein.

98.     Under 42 U.S. Code Section 1983, "every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."

99.     Under color of state law, Defendants Kronmiller, Wessely, Shannon and Sadler have deprived the Plaintiffs of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution.

100.    Under color of state law, the Defendants named in this Count Three have

21

deprived Home Care of the equal protection of the law on the basis of race in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution.

101.    Under color of state law, the Defendants named in this Count Three have violated and continue to violate the Fourteenth Amendment to the United States Constitution and 42 U.S. Code Section 1983.

102.    As a result of the discrimination by the Defendants named in this Count, the Plaintiffs have suffered, and continue to suffer financial damage and loss as specified below in the Prayers for Relief, including and not limited to the loss of the investment in purchasing the Home Care facility, money spent in responding to the administrative reports regarding alleged deficiencies, money spent in battling the administrative denial of Medicaid funds, money and profit relating to the loss of residents, and attorney's fees.

## COUNT FOUR
### (42 U.S. Code Section 1985)
### (Against Defendants Kronmiller, Wessely, Shannon and Sadler)

103.    Plaintiffs Leona Victors (Emenyonu) and Home Care, Inc. d/b/a Leona's Heart Assisted Living repeats and incorporates by reference under this Count Four Paragraphs 1-102, as if fully set forth herein.

104.    Defendants Kronmiller, Wessely, Shannon and Sadler have conspired with agents, servants, employees and officials of white owned or white controlled private organizations that are run by white managers to deprive the Plaintiffs of the equal protection of the laws.

105.    The Defendants named in this Count Four have violated and continue to violate 42 U.S. Code Section 1985 and one or more of the Defendants, including Defendants Shannon and Sadler, took numerous specific acts in furtherance of the conspiracy, including contacting

22

various people and groups doing business with the Home Care facility in an effort to impede Ms. Victors' and the Home Care facility's successful operation.

106.    As a result of the discrimination by the Defendants named in this Count, the Plaintiffs have suffered, and continue to suffer financial damage and loss as specified below in the Prayers for Relief, including and not limited to the loss of the investment in purchasing the Home Care facility, money spent in responding to the administrative reports regarding alleged deficiencies, money spent in battling the administrative denial of Medicaid funds, money and profit relating to the loss of residents, and attorney's fees.

## COUNT FIVE
### (Breach of Contract)
### (Against Defendant Crosson)

107.    Plaintiffs Leona Victors (Emenyonu) and Home Care, Inc. d/b/a Leona's Heart Assisted Living repeats and incorporates by reference under this Count Five Paragraphs 1-106, as if fully set forth herein.

108.    The purchase agreement executed between Defendant James F. Crosson ("Crosson") and Plaintiff Leona Victors (Emenyonu) on or about April 24, 2006 states specifically that Defendant Crosson was selling and transferring a valid OHCQ operating license and a valid DOA Medicaid waiver number to Ms. Victors as the new owner of Home Care, Inc. d/b/a Blue Heron Assisted Living subsequently changed to Home Care, Inc. d/b/a Leona's Heart Assisted Living.

109.    At the time when Defendant Crosson executed the purchase agreement, he knew either that he was not transferring the OHCQ operating license and/or the DOA Medicaid waiver number, or that DHMH, DOA, DWP and OHCQ, their agents, officials and representatives would question the validity of the OHCQ operating license and DOA

23

Medicaid waiver number specified in the purchase agreement to be sold to Ms. Victors.

110.    For example, the stock and membership purchase agreement executed by Defendant Crosson on April 24, 2006 states that "Neither Seller nor Home Care or Hill Road has any notice of, or any reason to believe that there is or has been any actual, threatened or contemplated termination of" the OHCQ operating license or DOA Medicaid waiver number.

111.    At the time when Defendant Crosson executed the purchase agreement, he also did not disclose that representatives of OHCQ had conducted a survey inspection of the Home Care facility in February 2006.

112.    Crosson also did not disclose correspondence exchanged between himself and DOA shortly after he signed the purchase agreement on April 24, 2006.

113.    Subsequent to the time after Defendant Crosson executed the purchase agreement, DHMH and OHCQ did in fact issue a report to correct alleged deficiencies as a result of the survey inspection in February 2006 during the time when Defendant Crosson was owner of the Home Care facility.

114.    As a result, Defendant Crosson breached the purchase agreement by not disclosing the survey inspection in February 2006.

115.    As a result of the breach by Defendant Crosson, the Plaintiffs have suffered, and continue to suffer financial damage and loss as specified below in the Prayers for Relief, including and not limited to the loss of the investment in purchasing the Home Care facility, money spent in responding to the administrative reports regarding alleged deficiencies, money spent in battling the administrative denial of Medicaid funds, money and profit relating to the loss of residents, and attorney's fees.

## COUNT SIX
### (Breach of Implied Covenant of Good Faith and Fair Dealing)
### (Against Defendant Crosson)

116.   Plaintiffs Leona Victors (Emenyonu) and Home Care, Inc. d/b/a Leona's Heart Assisted Living repeats and incorporates by reference under this Count Six Paragraphs 1-115, as if fully set forth herein.

117.   Under Maryland law, by virtue of the intentions of the parties as expressed in the purchase agreement executed between Plaintiffs and Defendant James F. Crosson ("Crosson") on or about April 24, 2006, and the circumstances of how and why the purchase agreement was formed and intended, Defendant Crosson was obligated under an implied covenant of good faith and fair dealing to disclose any and all information that would impact, effect and/or negate the ability of Ms. Victors to operate the Home Care facility.

118.   At the time when Defendant Crosson executed the purchase agreement, Home Care, Inc. d/b/a Blue Heron Assisted Living was operating on a profitable basis.

119.   At the time when Defendant Crosson executed the purchase agreement, Defendant Crosson knew that Plaintiff Leona Victors (Emenyonu) intended and expected to likewise operate the Home Care facility on a profitable basis.

120.   At the time when Defendant Crosson executed the purchase agreement, Crosson also did not disclose that representatives of OHCQ had conducted a survey inspection of the Home Care facility in February 2006.

121.   Crosson also did not disclose correspondence exchanged between himself and DOA shortly after he signed the purchase agreement on April 24, 2006.

122.   Subsequent to the time after Defendant Crosson executed the purchase agreement, DHMH and OHCQ did in fact issue a report to correct deficiencies as a result of

the survey inspection in February 2006 during the time when Defendant Crosson was owner of the Home Care facility.

123. As a result, Defendant Crosson breached the implied covenant of good faith and fair dealing recognized under Maryland law underlying all contracts executed in the state of Maryland.

124. As a result of the breach of the implied covenant of good faith and fair dealing by Defendant Crosson, the Plaintiffs have suffered, and continue to suffer financial damage and loss as specified below in the Prayers for Relief, including and not limited to the loss of the investment in purchasing the Home Care facility, money spent in responding to the administrative reports regarding alleged deficiencies, money spent in battling the administrative denial of Medicaid funds, money and profit relating to the loss of residents, and attorney's fees.

**COUNT SEVEN**
**(Tortious Intentional Interference with Prospective Advantage)**
**(Against Defendant Crosson)**

125. Plaintiffs Leona Victors (Emenyonu) and Home Care, Inc. d/b/a Leona's Heart Assisted Living repeats and incorporates by reference under this Count Seven Paragraphs 1-124, as if fully set forth herein.

126. On or about April 24, 2006, when Defendant James F. Crosson ("Crosson") executed the purchase agreement between the parties, Crosson knew that the Plaintiffs expected to operate a profitable business at the Home Care facility.

127. Soon after Defendant Crosson sold the Home Care facility to Plaintiff Leona Victors (Emenyonu), he began a campaign to interfere with Ms. Victors' ability to operate the Home Care facility on a profitable basis.

26

128.    While Defendant Crosson, a white male, intended to benefit from the $1 million purchase price by selling the Home Care facility to Ms. Victors, Defendant Crosson did not want to see an African American person operate his facility, and specifically acted, both directly and through agents, to thwart Ms. Victors' ability to operate the Home Care facility on a profitable basis.

129.    For example, soon after Defendant Crosson sold the Home Care facility to Ms. Victors, his wife, Sandy Ironmonger, began visiting the Home Care facility as frequently as three times a week, even though, his wife had never visited the facility when her husband owned it for at least five years prior to the sale.

130.    The reason for these visits was for the specific purpose to interfere with Ms. Victors' authority and ability to run the facility, by contacting staff and residents, and encouraging both to leave the facility under Ms. Victors' authority.  For example, Ms. Ironmonger indicated that she and her husband know people in DHMH, OHCQ and DOA and that Ms. Victors will be "shut down in no time" and that her Medicaid waiver number would be "yanked" and that Ms. Victors would "never get it back, no matter what she did."

131.    These statements by Ms. Ironmonger and other action by Defendant Crosson and agents like his wife were made with the specific, knowing, willful and intentional purpose to interfere with Ms. Victors' prospective advantage, business opportunity, and ability to run the Home Care facility on a profitable basis.

132.    It is also believed, upon information and belief, that Defendant Crosson and agents like his wife did indeed contact various government and agency officials in Upper Shore Aging, DOA, DWP, OCHQ and DHMH, including Defendants Sadler and Shannon, with the specific purpose to use his influence over such officials to encourage the

27

governmental agencies and units to harass and discriminate against Ms. Victors, and impede her ability to run the Home Care facility on a profitable basis.

133.    Defendant Crosson knew and intended that his intentional interference with Ms. Victors' ability to run the Home Care facility on a profitable basis would cause her to shut down the business.

134.    Defendant Crosson knew and intended that his intentional interference with Ms. Victors' ability to run the Home Care facility on a profitable basis would allow assisted living facilities run by white individuals in the Caroline County, Maryland to compete successfully against Ms. Victors.

135.    Defendant Crosson succeeded in his attempts to interfere with and impede Ms. Victors' ability to run the Home Care facility on a profitable basis.

136.    At the time when Defendant Crosson sold the Home Care facility to Ms. Victors, there were 26 residents living at the facility out of a possible 31 beds. As a result of the discrimination and other violations of law by Defendant Crosson, as well as the other Defendants named in this Complaint, there are now 8 residents living at the facility under Ms. Victors' ownership.

137.    Defendant Crosson acted with the aggravated conduct of malice, fraud, misrepresentation and purposeful ill will of racism and discrimination, as alleged above.

138.    As a result of Defendant Crosson's intentional interference as alleged above, the Plaintiffs have suffered, and continue to suffer financial damage and loss as specified below in the Prayers for Relief, including and not limited to the loss of the investment in purchasing the Home Care facility, money spent in responding to the administrative reports regarding alleged deficiencies, money spent in battling the administrative denial of Medicaid

28

funds, money and profit relating to the loss of residents, attorney's fees, and punitive damages.

PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs Leona Victors (Emenyonu) and Home Care, Inc. d/b/a Leona's Heart Assisted Living respectfully request that this Honorable Court grant the following relief:

A.     Declare that Defendants Kronmiller, Wessely, Shannon and Sadler have violated 42 U.S. Code Sections 1981 and 1982; the Fourteenth Amendment to the United States Constitution and 42 U.S. Code Section 1983; and, 42 U.S. Code Section 1985.

B.     Enjoin the illegal and unconstitutional conduct of Defendants Kronmiller, Wessely, Shannon and Sadler.

C.     Award Plaintiff compensatory damages in the amount of $3 million and punitive damages in the amount of $10 million against Defendants Kronmiller, Wessely, Shannon and Sadler.

D.     Award the Plaintiffs their reasonable attorney's fees and cost pursuant to 42 U.S. Code Section 1988(b).

E.     Award judgment against Defendant Crosson for violation of Counts Five, Six and Seven in the complaint;

F.     Award compensatory damages in the Plaintiffs' favor and against Defendant Crosson in the amount of $3 million;

G.     Award punitive damages in the Plaintiffs' favor and against Defendant Crosson for violation of Count Seven in an amount of $10 million;

29

H.    Award such other and further relief as this Honorable Court may deem appropriate and equitable including other injunctive and declaratory relief as may be required to serve the interest of justice.

Respectfully Submitted,

_____

Michael R. Carithers, Jr. (#27272)
Brown & Sheehan, LLP
One South Street, Twenty-Third Floor
Baltimore, Maryland 21202
Telephone:     410-951-8769
Facsimile:      410-296-1559

*Attorney for Plaintiff*

Dated:  August 28, 2007