IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| LEONA VICTORS (EMENYONU), ET AL. | * | |
| | * | |
| v. | * | Civil No. JFM-07-2282 |
| | * | |
| WENDY A. KRONMILLER, ET AL. | * | |
| | ***** | |

**MEMORANDUM**

On August 28, 2007, plaintiffs Leona Victors and Home Care, Inc. d/b/a Leona's Heart Assisted Living ("Home Care") filed federal claims against defendants Wendy A. Kronmiller, Jane Wessely, Barbara Shannon, and Ed Sadler, and state contract and tort claims against defendant James F. Crosson. This case arises from Crosson's sale of Home Care, an assisted living facility in Greensboro, Maryland, to Leona Victors, and the subsequent problems with the facility's license and Medicaid waiver provider status. On March 6, 2008, I granted in part and denied in part defendants' motion to dismiss the federal claims, and denied defendant Crosson's motion to dismiss the state law claims.[1] Defendants now move for summary judgment.[2]

---

[1] In the March 6, 2008 Order, I dismissed Counts One and Two as to the "State Defendants" on the grounds that 42 U.S.C. §§ 1981 and 1982 do not provide an independent cause of action against state actors. *See Victors v. Kronmiller*, 553 F. Supp. 2d 533, 542-43 (D. Md. 2008). Based on that ruling, I will also dismiss Counts One and Two as to defendant Sadler.

[2] I previously granted plaintiffs' motion for leave to file a sur-reply brief. Defendants have filed a motion to alter or amend that judgment. The motion is denied as moot.

1

## I. Facts[3]

Home Care, Inc. was an assisted living facility located in Greensboro, Maryland, in Caroline County. Defendant Crosson possessed an operating license for Home Care from the Maryland Office of Health Care Quality ("OHCQ") that was valid until December 11, 2006, and a Medicaid waiver program provider number. During that time, Home Care was known as "Blue Heron." On April 24, 2006, defendant Crosson executed a purchase agreement to sell Home Care to Victors. On June 9, 2006, Victors purchased the facility through a stock sale transaction. Shortly after the purchase, Victors changed the name of the facility to Leona's Heart Assisted Living, and met with Upper Shore Aging representatives[4] who told Victors she needed to apply for a new license and a new Medicaid waiver provider number.

Unbeknownst to Victors, on April 28, 2006, the Department of Health and Mental Hygiene ("the Department") had advised Crosson that he was required to notify the Department if there was a change in ownership of Home Care, and that a new owner would need to apply for a new license and Medicaid waiver number, as the existing ones were not transferable. Crosson responded that Blue Heron was "not going through a change of ownership." (Defs.' Ex. 12.)[5] The sale of Home Care was not disclosed to the Department until after closing.

Also unbeknownst to Victors, in February 2006, OHCQ had conducted a survey at Blue

---

[3] The facts are viewed in the light most favorable to plaintiffs. Given my dismissal of the state law claims, I set forth here only the facts relevant to the federal claims.

[4] Upper Shore Aging is the Area Agency on Aging, per the Older Americans Act, responsible for certain counties in Maryland. It administers certain programs under Maryland law and the Older Americans Act.

[5] Unless otherwise noted, exhibit numbers reference the exhibits to the State Defendants' Motion for Summary Judgment and Plaintiffs' Opposition to State Defendants' Motion for Summary Judgment.

Heron, with defendant Shannon as the lead surveyor. Defendant Kronmiller was the Director of OHCQ, a position she had held only since October 2005. OHCQ is an office in the Department "responsible for monitoring and inspecting assisted living programs to ensure compliance with the regulatory requirements of this chapter." (Defs.' Ex. 1, Code of Maryland Regulations ("COMAR") 10.07.14.47(A), *superseded effective* Dec. 29, 2008.[6]) The regulations contain extensive requirements for staffing, operations, and recordkeeping. Pursuant to the regulations, the "Department may conduct unannounced or announced licensure or complaint investigation visits." *Id.* 10.07.14.47(C); *see also id.* 10.07.46(A) (stating that a facility "shall be open at all reasonable times to announced or unannounced inspections by the Department and by any agency designated by the Department"). If regulatory violations are identified during a visit, "the Secretary shall issue a notice" that cites the violations, requires the program to submit an acceptable plan of correction, and notifies the assisted living program that failure to correct the violations may result in sanctions. *Id.* 10.07.14.46(D). The regulations make available a wide variety of sanctions. *Id.* 10.07.14.48.

During OHCQ's February survey of Blue Heron, numerous violations were found, including incomplete medical records, lack of proper training for employees, failure to report resident abuse, inadequate safeguards to protect residents' personal funds, failure to keep the facility clean and free of insects and rodents, and lack of assist rails. (*See* Pls.' Ex. 18.) Because of the extent of the deficiencies, the Department created a "Directed Plan of Correction." A draft of the deficiency report was completed by March 2006, but was not released until June 21, 2006,

---

[6]This opinion refers to the COMAR regulations concerning Assisted Living Programs, contained in Title 10, Subtitle 17, Chapter 14, that were in effect during the events in this case. On December 29, 2008, revisions to the assisted living regulations became effective.

after Victors became the owner of the facility.

Defendant Sadler had become the local Ombudsman for Caroline County and Talbot County in December 2005, after serving as Case Manager in the Caroline County area. The Ombudsman program is administered by Upper Shore Aging. The Ombudsman receives and resolves complaints made by or for facility residents, educates consumers and care providers about residents' rights and good practices, provides information to the public, and promotes community involvement. Under the regulations, the Ombudsman is required to refer to the Department's designated liaison any suspected violations of statutes or regulations that the Ombudsman is unable to resolve. *See* COMAR 32.03.02.06(B). The Ombudsman position has no authority in and of itself. Plaintiffs allege that Sadler rarely visited Blue Heron before Victors became the owner, but visited daily beginning June 14, 2006. Plaintiffs allege that Sadler told Victors, "You will not be allowed to practice in this county. You will be shut down." (Pls.' Ex. 5 ¶ 11.) Sadler also questioned Victors about her native country Nigeria. (Pls.' Ex. 7 ¶ 2.)[7]

A second survey was conducted from August 28, 2006, through September 1, 2006.[8]

---

[7] An affidavit submitted in opposition to a motion for summary judgment must "set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(e). Plaintiffs' memoranda and affidavits contain numerous statements that constitute inadmissible hearsay. (*See, e.g.*, Pls.' Mem. in Supp. of Opp'n to State Defs.' Mot. for Summ. J. ("Pls.' State Mem.") 22 [Victors's recounting of Brown's and Williams's statements]; *id.* 23 [Victors's recounting of Williams's statements]; *id.* 24 [Victors's recounting of Sraver's statements]; *id.* 34 [Smith's recounting of Thayer's statements]; *id.* 36 n.20 [Victors's recounting of statements by Fish]; *id.* 43 [Victors's recounting of statements by Williams]; *id.* 46 [Smith's recounting of two employees' statements].) I do not consider those statements in reaching my conclusions.

[8] The regulations provide that the "Department, or those agencies delegated responsibility under this regulation, have the authority to inspect an assisted living program more frequently through follow-up surveys, if it is considered necessary to ensure compliance with this chapter or for the purposes of investigating a complaint." COMAR 10.07.14.47(F).

During this visit, plaintiffs allege that Shannon told Sadler, "You and Jim take care of your end. Wendy and I will take care of our end." (Pls.' Ex. 5 ¶ 12.) A second deficiency report and Directed Plan of Correction was issued on September 25, 2006. Another survey was conducted in November 2006, and another report was issued less than one month later, again listing numerous deficiencies. A fourth survey was conducted in February 2007. Plaintiffs allege that Shannon told Kronmiller while at the facility in February 2007, "I am not going to allow this African to own this big facility. I have asked Ed to cover Jim's side while we cover the OHCQ part." (Pls.' Ex. 8 ¶ 9(h)). An OHCQ operating license was issued for Leona's Heart without conditions effective April 11, 2007. (Pls.' Ex. R.)

Defendant Wessely was chief of the Division of Waiver Programs, which administers the Medicaid Older Adults Waiver ("OAW"). The Maryland Department on Aging oversees daily administration of the OAW.[9] Waiver programs "waive" certain federal requirements in order to provide Medicaid-funded services in a community setting to individuals who meet the requirements for institutional level of care. As a condition of providing federal Medicaid funds for these services, the federal government requires that the Department ensure that the health and safety of participants are protected and the federal funds are not misused. *See* 42 C.F.R. § 441.302; *id.* § 441.303. Facilities providing services to Medicaid waiver recipients must meet state licensure requirements and comply with all regulations. *See id.* § 441.302(a)(2); *id.* § 441.310. A provider eligible to receive Medicaid reimbursement under the OAW is identified

---

[9]Under the applicable regulations, "[i]n accordance with an interagency agreement, the Department may delegate certain aspects of its monitoring, inspection, or waiver responsibilities to the Department of Aging, the Department of Human Resources, or a local health department." COMAR 10.07.14.47(B).

5

by the Department's issuance of an individual account number. *See* COMAR 10.09.36.01B(13). This number enables the provider to bill Medicaid for services rendered to OAW recipients.

On June 20, 2006, Wessely referred Home Care to the Office of the Inspector General due to reports from the Maryland Department of Aging regarding the misappropriation of patients' funds. Victors had been informed in June that she could use Crosson's waiver number temporarily until she obtained her own number, and was reminded again in July that she must apply to be a waiver provider (Defs.' Ex. 14), yet Victors did not complete an application for a new number until August. On September 15, 2006, Wessely wrote a letter to plaintiffs, stating that "due to your fraudulent billing, the Department is withholding Medicaid payments to you for assisted living services under the Waiver for Older Adults." (Pls.' Ex. A.) On September 18, 2006, Wessely wrote that "you have billed Medicaid for waiver assisted living services utilizing the Medicaid provider number that was assigned to the previous owner. These funds must be returned to the department . . . . You are not a Medicaid provider and have fraudulently submitted claims for Medicaid payment." (Pls.' Ex. B.) By September 19, 2006, the Maryland Department of Aging had decided to relocate residents that wished to continue receiving waivers to an approved waiver provider facility.[10] Those residents were relocated from approximately

---

[10]On September 20, 2006, Craig Gibson, the "Waiver Case Manager," notified the residents of Leona's Heart that the facility was no longer a waiver provider. (Defs.' Ex. 15.) The letter stated that the residents were required to move if they wanted to stay in the waiver program. The letter further provided:
> You do not have to stay in the Waiver program. If you decide to leave the program, you will lose your Waiver services. You may be able to get some of these services through regular Medicaid, but regular Medicaid will not pay for you to live in an assisted living home. This is your decision: whether you want to stay in the Waiver, continue receiving Waiver services, and move to a new home OR sign a paper that says you do not want to be in the Waiver anymore.

(*Id.*)

6

September 29, 2006, to October 1, 2006.

## II. Standard of Review

A motion for summary judgment will be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The substantive law of the cause of action determines which facts are material. *Id.* "[N]either unsupported speculation, nor evidence that is merely colorable or not significantly probative, will suffice to defeat a motion for summary judgment . . . ." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (internal quotation marks, alteration marks, and citations omitted).

## III. 1983 Claims

Plaintiffs bring a Section 1983 claim against defendants Kronmiller, Wessely, Shannon, and Sadler, alleging that under color of state law defendants deprived plaintiffs of due process of law and equal protection of the law.[11]

### A. Due Process

In order to state a procedural due process claim, plaintiffs must demonstrate that (1) they

---

[11] Plaintiffs' Section 1983 claim against Sadler is based only on a violation of the Equal Protection Clause. (Pls.' Opp'n to Def. Sadler's Mot. for Summ. J. ("Pls.' Sadler Mem.") 16.)

7

had a property interest (2) of which defendants deprived them (3) without due process of law. *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 826 (4th Cir. 1995). Property interests are created not by the Fourteenth Amendment, but "by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). "[T]o have a property interest in a benefit, a person must have a 'legitimate claim of entitlement to it.' A mere 'abstract need or desire for it' or 'a unilateral expectation of it' is insufficient." *Tri-County Paving, Inc. v. Ashe County*, 281 F.3d 430, 436 (4th Cir. 2002) (*quoting Roth*, 408 U.S. at 577).

    *1. Wessely*

Plaintiffs' due process claim against defendant Wessely rests on two purported constitutionally protected property interests related to the Medicaid waiver program: (1) the facility's existing Medicaid waiver provider agreement, and (2) "the Medicaid waiver residents who would not be able to live at the facility but for the Older Adult Waivers Program."[12] (Pls.' State Mem. 27.)

Plaintiffs base their property interest in the facility's Medicaid waiver provider agreement on Victors's purchase of the Home Care, Inc. stock. (*Id.*) They allege Wessely

---

[12]Plaintiffs further claim that a constitutionally protected property interest was permanently deprived when Home Care was "placed in a lifetime ban from the Older Adults Waiver Program." (Pls.' State Mem. 29.) However, the exhibit cited in support of this allegation is a memorandum from F. Warren Sraver, Manager of Older Adults Waiver, to Wessely. Plaintiffs misleadingly characterize this memorandum as "Defendant Wessely's memorandum." (Pls.' Sadler Mem. 4.) The memorandum recommended that Home Care and Blue Heron be disenrolled as a service provider and that "a lifetime ban on future participation in the Older Adult Waiver . . . be implemented." (Pls.' Ex. H.) Plaintiffs fail to provide evidence that this recommendation became effective or, if it did, that Wessely was involved in making that decision.

deprived them of this interest when Wessely sent a letter on September 15, 2006, withholding Medicaid payments and stating Victors was not an approved Medicaid waiver provider, and a letter on September 18, 2006, requesting repayment of waiver payments made to Victors's facility. (Pls.' Exs. A & B.)

The letters informed plaintiffs of their right to appeal that decision under COMAR 10.09.36.09. (*Id.*) This regulation provides:

> A. Providers filing appeals from administrative decisions made in connection with these regulations shall do so according to: (1) COMAR 10.01.03; (2) State Government Article, Title 10, Subtitle 2, Annotated Code of Maryland; and (3) Health-General Article, §§ 2-201-2-207, Annotated Code of Maryland.
> B. Appeals shall be filed within 30 days of receipt of notice of administrative decisions.

COMAR 10.09.36.09. Plaintiffs did appeal the decision and received a favorable decision from the Administrative Law Judge. The Department then filed Exceptions to the ALJ's decision. After submission of the summary judgment briefings in this case, a designee of the Secretary of the Department of Health and Mental Hygiene affirmed and modified the ALJ's decision in a "Final Decision" issued March 11, 2009. (Docket No. 73.) The parties have thirty days to appeal the Final Decision to the Board of Review. (*Id.*)

Plaintiffs essentially assert no unfairness in the procedure,[13] but instead argue that the department's initial decision to withhold payment and request reimbursement was mistaken and unsupported by the evidence. *See Sylvia Dev.*, 48 F.3d at 827. However, as plaintiffs have received all of the process to which they were entitled, and in fact used the procedures to obtain

---

[13] Even if plaintiffs did argue that they were entitled to a predeprivation hearing, the Fourth Circuit has found in the context of suspension of a provider's participation in the Medicare program that a prompt postdeprivation hearing is sufficient to satisfy due process. *See Ram v. Heckler*, 792 F.2d 444, 447 (4th Cir. 1986).

9

a favorable result, plaintiffs cannot make out a procedural due process claim as to their interest in the Medicaid waiver provider agreement.  *See id.*

As to plaintiffs' purported property interest in the waiver residents, plaintiffs posit that the "facility's claim as to the Medicaid waiver provider number also carries with it a claim to the residents who depend on the waiver to live at the residence."  (Pls.' State Mem. 27.)  While I question whether plaintiffs have identified a legitimate property interest, I need not reach that issue because plaintiffs have failed to show that Wessely was personally involved in the decision to remove the residents.  It is clear that "[i]n order for an individual to be liable under § 1983, it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.'"  *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (*quoting Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)).  Here, plaintiffs have failed to present evidence showing that Wessely was "personally involved, directly or in a supervisory capacity, in the deprivation of [plaintiffs'] federally protected rights."  *Davis v. Dep't of Social Servs. of Baltimore County*, 941 F.2d 1206, 1991 WL 157258, at *5 (4th Cir. Aug. 19, 1991) (unpublished table op.).

Plaintiffs not only fail to present evidence that Wessely was personally involved in deciding to remove the residents, but the evidence indicates that Wessely was *unaware* of this decision until after it was made.  On September 6, 2006, Wessely wrote, "Can you please update us?  We did not know that there was a decision to move the waiver folks.  Are you recommending disenrollment?"  (Pls.' Ex. 25, at 2.)  Maryam Baharloo responded, "We have to move the clients because of all the problems with the quality of care provided and OHCQ's deficiency findings.  Denise Williams suggested that we start looking for placements for the

10

clients, OHCQ may deny the new owner's application. Denise said that they were going to meet today to discuss their findings and decide the next steps." (*Id.* at 1.) Moreover, Wessely wrote, "[W]hat is this about 'new owner'?" implying that Wessely did not know by September 2006 that Crosson no longer owned Home Care. (*Id.*) Indeed, Victors admits that she has never met Wessely or spoken to her. (Victors Dep. 192:14-193:1, May 15, 2008.) On September 19, 2006, F. Warren Sraver, Manager of Waiver for Older Adults of the Maryland Department of Aging, wrote to Kathleen Garson, Waiver Coordinator of Upper Shore Aging, stating, "Per your conversation with Michelle Brown and in regard to the faxed copies of DHMH letters to Blue Heron Assisted Living, the waiver participants who now reside at Blue Heron must be relocated. DHMH has suspended all payments and Blue Heron is no longer an approved Waiver provider." (Pls.' Ex. C.) Wessely was carbon-copied on this message, but was not mentioned as involved in the decision-making process. Given the lack of evidence of Wessely's involvement, I grant summary judgment as to this claim.

   *2. Shannon and Kronmiller*

Plaintiffs' due process claim against defendants Shannon and Kronmiller arises from plaintiffs' alleged property interest in the facility's OHCQ operating license.[14] (*See* Pls.' State Mem. 29.) Plaintiffs admit that "the facility's OHCQ license was never revoked." (*Id.* 3.)

---

[14]Plaintiffs allege that "Kronmiller and Shannon also caused the facility's Medicaid waiver provider number to be suspended by threatening to revoke the OHCQ operating license in September 2006." (Pls.' State Mem. 30.) The only support plaintiffs provide is an e-mail from Denise Williams, who is not a party in this case, to Wendy Kronmiller, discussing five major areas of concern with Blue Heron. (Pls.' Ex. D.) The e-mail notes that after Williams's meeting with Lester Brown and William Dorrill, "we have decided that we would do a revocation of license for Leona's Heart." (*Id.*) The e-mail makes no reference to the Medicaid waiver program.

Instead, they claim Shannon and Kronmiller deprived them of this property interest when the renewal of the facility's OHCQ license was delayed. The license, which expired in December 2006, was not reissued until April 2007. (Pls.' Ex. R.)

On defendants' motion to dismiss, I found that "[a]lthough plaintiffs complain about the delay in Kronmiller's providing the operating license, they do not allege that any rule or regulation entitled them to receive the license any earlier, and thus do not plausibly allege a due process violation." *Victors*, 553 F. Supp. 2d at 547. Plaintiffs attempt to correct this by pointing to the regulation in COMAR 10.07.14.06(A). (*See* Pls.' State Mem. 29.) This regulation states that to "obtain and maintain a license, an applicant shall meet all of the requirements of: (a) This chapter; (b) Other applicable laws and regulations; and (c) Health-General Article, § 19-311, Annotated Code of Maryland, if the program provides services to 17 or more residents." COMAR 10.07.14.06(A). It lists the application procedures, licensing fees, and documentation that should be provided with the application. *See id.* This provision does not create an entitlement for plaintiffs to receive their license any earlier, thus plaintiffs still fail to allege a due process violation as to the OHCQ operating license.

### B. Equal Protection

Plaintiffs assert equal protection claims against Kronmiller, Shannon, Wessely, and Sadler, based on their allegedly selective enforcement of facially neutral regulations and policies. To establish this type of equal protection claim, plaintiffs must show that (1) they have been treated differently than others with whom they are similarly situated, and (2) the unequal treatment resulted from intentional or purposeful discrimination. *Morrison v. Garraghty*, 239

F.3d 648, 654 (4th Cir. 2001). Plaintiffs' equal protection claims fail because they do not establish sufficient facts showing that defendants treated them differently than those similarly situated.

*1. Shannon*

Plaintiffs assert Shannon treated them differently than Crosson, the prior owner of Victors's facility, by 1) failing to release the deficiency report, drafted when Crosson was owner, until June 2006, when Victors was owner; and 2) reporting deficiencies and problems, including problems with resident funds, when Victors was the owner, but not when Crosson was the owner. (Pls.' State Mem. 30-36.)[15] However, plaintiffs fail to substantiate that Shannon in fact treated Crosson differently than Victors. Far from ignoring complaints about Crosson's facility, Shannon conducted a comprehensive survey in February 2006, while Crosson was owner, and drafted a lengthy deficiency report and plan of correction. While defendants cannot explain why the deficiency report was not released until June,[16] the report itself was drafted *before* Victors purchased Home Care, thus before any discriminatory intent could have arisen. As to the problem with resident funds, plaintiffs provide no evidence that Shannon received the same information regarding resident funds and did not act on it while Crosson was the owner. Indeed, issues with resident funds were addressed in the deficiency report that was drafted while Crosson

---

[15] While plaintiffs argued in previous filings that other facilities in the area were treated differently by Shannon, Kronmiller, and Wessely, plaintiffs no longer make this argument as to these defendants.

[16] As plaintiffs recognize, there was a shortage of OHCQ surveyors; for 1,600 assisted living programs, there were only twenty-four surveyors. (Pls.' State Mem. 14.)

was the owner. Moreover, Victors's facility was the subject of an extensive Directed Plan of Correction and OHCQ deficiency report, and any warning signs would understandably be taken more seriously.[17]

   *2. Kronmiller*

Plaintiffs rest their equal protection claim against Kronmiller on allegations that Kronmiller knew of Shannon's bias but did not take action, failed to remove Shannon as lead surveyor, allowed Shannon to report false deficiencies, and delayed the licensing process. (Pls.' State Mem. 40-45.) However, plaintiffs present no evidence or argument that Kronmiller treated plaintiffs differently than similarly situated individuals. While plaintiffs assert generally that when Crosson owned the facility, no licensure conditions were required and no deficiencies were acted upon, plaintiffs fail to provide any evidence that Kronmiller was aware of deficiencies yet chose to ignore them.

   *3. Wessely*

For their equal protection claim against Wessely, plaintiffs assert that Wessely made no effort to challenge the facility's enrollment in the Medicaid waiver provider program while Crosson owned the facility, even though Wessely knew there were problems with residents at Blue Heron. (Pls.' State Mem. 36-37.) Crosson is not similarly situated to plaintiffs in this

---

[17]Plaintiffs' evidence of intentional discrimination is also weak. Plaintiffs provide one probative statement as to racial animus. Victors's business partner, Keven Nlemchi, allegedly heard Shannon tell Kronmiller that "I am not going to allow this African to own this big facility." (Pls.' State Mem. 35.) I note, however, that this statement was revealed for the first time in plaintiffs' opposition to defendant's motion for summary judgment. This statement was not provided in the Complaint, in plaintiffs' interrogatory responses, during discovery, or by plaintiff Victors during her deposition.

respect, however, because Crosson's status as a Medicaid waiver provider was not in question. Crosson was not a new owner of an assisted living facility. Moreover, the Department of Aging took the position, *before* Victors purchased the facility, that the waiver provider agreement would not transfer to a new owner. (Pls.' Opp. to Def. Crosson's Mot. for Summ. J., Ex. 11 (stating that if the facility was undergoing a change in ownership, Crosson must notify the Department of Aging, because "the waiver number assigned to this facility **is not** transferable to a different owner") (emphasis in original).) There could have been no discriminatory intent by defendants at that point, as Victors had not yet purchased Home Care.

Plaintiffs also claim that Wessely reported misappropriation of clients' funds while Victors was the owner, but failed to report those same matters while Crosson was the owner. However, it is purely speculative that Wessely had become aware of misappropriation of funds prior to July 2006 yet failed to act. (*See* Pls.' State Mem. 37-38.)

*4. Sadler*

For the equal protection claim against Sadler, plaintiffs also use Crosson as a comparator.[18] Plaintiffs claim that while Crosson owned Home Care, Sadler never made a report to OHCQ, never questioned the facility's use of a delegated nurse or available resources for the residents, and did nothing about the borderline conditions at Blue Heron. The evidence shows, however, that Sadler knew a deficiency report was being created by OHCQ, and that therefore OHCQ was aware of the problems at Blue Heron. Moreover, Sadler had only become the

---

[18]Plaintiffs allege there is evidence that Sadler "bypassed items at Leslie Ruhl's assisted living facility, Haven House, which he did not bypass for the Plaintiffs." (Pls.' Sadler Mem. 28.) As plaintiffs support this allegation solely with self-serving hearsay, the use of Haven House as a comparator will not be considered.

15

Ombudsman in December 2005, and thus had not been in his position long before Victors purchased the facility.

Plaintiffs also assert that Sadler played a substantial role in having the Medicaid waiver residents removed. Plaintiffs provide no support for this statement, and misleadingly cite to exhibits which plainly contradict their assertion. Plaintiffs state that "Defendant Sadler was at the facility arranging for the residents to be removed, against their wishes." (Pls.' Sadler Mem. 34; *see also id.* 24.) For this proposition, plaintiffs cite to Sadler's deposition testimony, in which Sadler denies being at the facility when the residents were removed, and to Renee Smith's affidavit, in which Smith states she does not remember Sadler being at the facility when the residents were removed. (*See* Pls.' Sadler Mem. 24, 34; Sadler Dep. 233:11-235:11; Pls.' Ex. 14 ¶ 20.) Even if they had provided evidence that Sadler was involved, they point to no similarly situated facility that was treated differently by Sadler. Pure speculation will not suffice to survive summary judgment.

### IV. Conspiracy

Plaintiffs bring a civil conspiracy claim under 42 U.S.C. § 1985 against Kronmiller, Shannon, Wessely, and Sadler. Plaintiffs allege that

> from the moment Sadler laid eyes on Ms. Victors, seeing an African American woman, he vowed to 'shut down' the facility. He passed the information on to Shannon (directly) and Wessely (indirectly) that an African American woman owned the facility and the two, sharing Sadler's racial animus, joined the fray. Both Shannon and Wessely took extreme, unreasonable and completely opposite action against the facility versus their action, or inaction, when Crosson owned the facility. This sudden departure from the norm can only be explained by racial bias.

(Pls.' State Mem. 54.)

42 U.S.C. § 1985(3) provides:

16

> If two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

To prove a civil conspiracy under § 1985(3), a plaintiff must show:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995). Moreover, a plaintiff must show "an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights." *Id.* at 1377. As the Fourth Circuit stated in the context of a Section 1983 conspiracy case,

> [Plaintiffs] have a weighty burden to establish a civil rights conspiracy. While they need not produce direct evidence of a meeting of the minds, [plaintiffs] must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective. In other words, to survive a properly supported summary judgment motion, [plaintiffs'] evidence must, at least, reasonably lead to the inference that [defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan.

*Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996) (internal citations omitted). The Fourth Circuit has noted that "the law is well settled that merely conclusory allegations of conspiracy, unsupported by a factual showing of participation in a joint plan of action, are insufficient to support a section 1985(3) action against a motion for summary judgment." *Simmons*, 47 F.3d at 1376.

Plaintiffs' evidence of a conspiracy consists primarily of colleagues communicating with

17

each other in the course of their jobs.  For example, plaintiffs point to Wessely's statement that when a problem arose with a Blue Heron resident, Wessely wanted to bring together everyone involved with the resident's care – the Maryland Department of Aging, OHCQ, and Upper Shore Aging – to work towards a resolution.  (Pls.' State Mem. 47; Wessely Dep. 88:11-89:7.)  Far from being evidence of a conspiracy, this statement simply indicates that agencies are communicating with each other to resolve a problem.  Tellingly, plaintiffs point to communication between the defendants that occurred in March 2006, *before* Victors purchased the facility and the alleged conspiracy began, as an example of conduct that "exemplifie[s]" this sharing of information.  (Pls.' State Mem. 48.)  Evidence that colleagues "pass information back and forth between themselves" (*id.*) in the ordinary course of their jobs is not evidence that they intended to commit an unlawful objective.

Plaintiffs point to the timing and movements of the State Defendants' actions as "too coincidental" with the timing and movements of Sadler and Crosson.[19]  (Pls.' State Mem. 49.) But this evidence does not support an inference that defendants came to a mutual understanding to achieve an unlawful plan.  Not only is each act alleged by plaintiffs capable of an innocent interpretation, but the evidence put forth by plaintiffs "amounts to nothing more than rank speculation and conjecture.  It does not reveal that any member of this alleged conspiracy possessed an intent to commit an unlawful objective." *Hinkle*, 81 F.3d at 422.

Plaintiffs contend that the following two statements support a civil conspiracy:  an alleged statement by Shannon to Sadler, "You and Jim take care of your end.  Wendy and I will

---

[19]It is unclear why plaintiffs point to Crosson's actions, as plaintiffs have not pled that Crosson was part of this conspiracy.  (Compl. Count Three, ¶ 99.)

take care of our end," and an alleged statement from Shannon to Kronmiller, "I have asked Ed to cover Jim's side while we cover the OHCQ part." (Pls.' State Mem. 51.) However, these statements do not mention plaintiffs or indicate a meeting of the minds. There is no evidence linking these statements to a conspiracy to purposefully discriminate against plaintiffs. Plaintiffs' mere speculation about the meaning of these statements is not competent evidence of a conspiracy. *See Hinkle*, 81 F.3d at 422 n.3.

In sum, plaintiffs present no evidence concerning Shannon, Kronmiller, Wessely, and Sadler "that might give rise to an inference of an agreement to commit any acts, wrongful or otherwise." *Id.* at 422. Plaintiffs' entire claim is "based upon a theory without proof," and plaintiffs' "circumstantial evidence [is] probative of a conspiracy only through speculation and the piling of inferences." *Id.* at 423. At most, plaintiffs' evidence shows that state agencies were coordinating to address serious problems at Victors's facility. Given the lack of any direct or circumstantial evidence of an agreement to deprive plaintiffs of their constitutional rights, there is insufficient evidence on the conspiracy claim to survive summary judgment.

## V.  State Law Claims

Plaintiffs bring three counts of state law claims against defendant Crosson. Because I am granting summary judgment in favor of defendants on plaintiffs' federal claims, I will not exercise jurisdiction over Counts Five, Six, and Seven of the Complaint. See 28 U.S.C. 1367(c); *Gregory v. Otac, Inc.*, 247 F. Supp. 2d 764, 773 (D. Md. 2003); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well"). The state law claims will be dismissed, without prejudice to plaintiffs' right to assert the claims in state court. *See* Maryland Rule 2-101(b).

For the foregoing reasons, I dismiss Counts One and Two as to defendant Sadler, and Counts Five, Six and Seven as to defendant Crosson.  I grant summary judgment in favor of defendants Kronmiller, Wessely, Shannon, and Sadler on Counts Three and Four.  Defendants' motion to alter or amend judgment and strike plaintiffs' sur-reply is denied as moot.  A separate order to that effect is being entered herewith.


April 8, 2009                                    \_\_\_/s/_____
                                                 J. Frederick Motz
                                                 United States District Judge